IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:21-cr-00084

CHE DUSHON LARK

MEMORANDUM OPINION AND ORDER

Pending before the court is Defendant Che Dushon Lark's Motion to Suppress Evidence. [ECF No. 41]. On October 27, 2021, I held a hearing on the motion. [ECF No. 51]. At the hearing, questions regarding the alleged inclusion of a false statement in the affidavit for the search warrant arose. I told the parties to file briefs on the issue. [ECF Nos. 57, 59, 60]. Mr. Lark, in his response to the government's brief, requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to evaluate the allegation that the affiant included a false statement necessary to the finding of probable cause in the warrant affidavit. [ECF No. 59, at 6]. I find that I need no further instruction on this issue. For the following reasons, I **DENY** Mr. Lark's request for a *Franks* hearing as moot, and I **GRANT** Mr. Lark's motion to suppress all evidence seized from Mr. Lark's home on March 17, 2021.

I. BACKGROUND

Police investigation of Mr. Lark began when an informant told Detective Wesley Daniels that illegal drugs could be purchased from Mr. Lark. [ECF Nos. 47, at 3; 56, at 7:23–25]. The police caused the informant to arrange two drug buys from Mr. Lark over the phone. After talking with Mr. Lark, the informant was sent to meet Rebecca Dunlap in her car for the purchases, each occurring in parking lots. Using currency that was prerecorded by police, the informant completed controlled drug buys on February 23 and March 4, 2021. [ECF Nos. 47, at 3–4; 56, at 8, 9:15–20]. Mr. Lark was not present for either drug exchange.[1] [ECF No. 47 at 4; 56, at 8:23–25, 9:1–7]. These controlled buys are the subjects of Counts Two and Three of the Indictment. [ECF No. 20, at 2–3]. Based on these buys, police obtained a warrant to place a GPS tracker on Ms. Dunlap's car. [ECF No. 56, at 11:20–22].

Thereafter, on the night of March 16, 2021, police tracked Ms. Dunlap's car on a brief trip to Columbus, Ohio, and back to Charleston, West Virginia. [ECF No. 56, at 11:11–23]. They suspected that she made the trip to obtain drugs. [ECF No. 50-1, at 4 ¶ 3.a.]. On her return to Charleston, police stopped Ms. Dunlap for an unspecified traffic violation. [ECF No. 56, at 11:22–25]. Det. Daniels approached the car and engaged Ms. Dunlap in conversation. *Id.* She explained that Mr. Lark directed her to go to Columbus and pick up a package from a stranger to bring back to him. *Id.* at 12:1–9. She agreed to cooperate with the police investigation of Mr.

---

[1] At all times relevant to the instant motion, Mr. Lark was on home confinement due to unrelated pending charges in state court, and his comings and goings from his home were monitored. [ECF Nos. 47, at 3; 56, at 68:18–19].

Lark and gave consent to a search of her vehicle. *Id.* Police found approximately 900 grams of suspected meth and over 200 grams of suspected fentanyl in the passenger floorboard of Ms. Dunlap's car.[2] *Id.* Police followed Ms. Dunlap back to headquarters, where they decided to have her attempt a controlled delivery of the drugs to Mr. Lark at his home. *Id.* at 12:11–15. The first controlled delivery attempt failed. Ms. Dunlap parked near Mr. Lark's residence and called him multiple times, but he did not answer the phone. *Id.* at 43:6–8. After the failure, Ms. Dunlap and police returned to headquarters where they spent two hours planning a second controlled delivery attempt. *Id.* at 32:15–17.

During their subsequent conversation, Det. Daniels was told by Ms. Dunlap that she had been in Mr. Lark's house multiple times and that they had a prior sexual relationship. *Id.* at 13:20, 34:11–14. She also told police that Mr. Lark's child was likely present at his home. *Id.* at 14:3–4. And she told police that, at some point, she believed Mr. Lark had hidden a gun behind the panel of a laundry machine that required a screwdriver to remove. *Id.* at 41:14–18.

Ms. Dunlap told Det. Daniels that she had brought drugs from Ohio to Mr. Lark's home twice before, although there is no indication of when these trips may have occurred. *Id.* at 19:5–6. She had gone into Mr. Lark's home to complete delivery of the drugs each time before. *Id.* at 19:6–7 ("So she would go inside, deliver the package and she would be paid."). Nonetheless, Det. Daniels testified that for

---

[2] Ms. Dunlap reached a plea agreement with the government and pled guilty to interstate travel to promote, carry on and facilitate the distribution of methamphetamine and fentanyl. [Case no. 2:21-cr-00136, ECF Nos. 10, 12].

3

this delivery, it was the plan for Ms. Dunlap "to, under no circumstances, go inside of the residence" because police determined that it was unsafe. *Id.* at 12:23–24; 19:1–12.

While police were debriefing Ms. Dunlap, Mr. Lark returned her phone calls from the first attempted delivery and told her to come to his house. *Id.* at 18:15–16. Neither Ms. Dunlap nor Mr. Lark directly mentioned drugs during their telephone conversation. *Id.* at 34:15–20, 37:5–10. The police then gave Ms. Dunlap a recording device and a small amount of the seized fentanyl in a package to deliver to Mr. Lark. *Id.* at 52:8–11. They followed her to Mr. Lark's home for the second controlled delivery attempt. *Id.* at 37:21–22

Ms. Dunlap received a phone call from Mr. Lark on her way to his home which continued after she got out of her car and as she approached his front door. [ECF No. 57-3, 7:21–9:15]. Police parked discretely down the street and listened through the video and audio recording device that Ms. Dunlap carried. [ECF No. 56, at 19:15–16]. Det. Daniels testified that it was too dark to see anything on the video recording, but at some point they decided it had been "sufficient time for Ms. Dunlap to be approaching the residence" so "rather than wait too long" police "made the decision to go ahead and approach" even though they knew Ms. Dunlap had not yet reached the house. *Id.* at 20:4–5; 45:16–18; 45:9–13 (THE COURT: "If I understood your testimony, you could hear her after she encountered the Defendant, but she had not reached the door of the house based on what you

4

listened to?" DANIELS: "That's correct, yes, sir."). Five to six officers approached the front of the house while five to six more officers remained in a vehicle at the back of the house. *Id.* at 21:5–9.

Det. Daniels testified that as police got closer to the residence, he saw that Mr. Lark was poking his head out of his front door to greet Ms. Dunlap. *Id.* at 20:6–13. Police then called out to Mr. Lark; when he saw and heard the officers, Mr. Lark immediately shut and locked his door. *Id.* at 20:18–20. Using photographs of the front area of Mr. Lark's home, Det. Daniels indicated that when police saw Mr. Lark, Ms. Dunlap was apparently completely off the path to Mr. Lark's front steps, inexplicably about 20 feet away from the house in a dark corner of his front yard. [ECF No. 57-1]. Police ran past Ms. Dunlap to the door, knocked and announced their presence, and after Mr. Lark did not respond to multiple commands, forced entry with a battering ram. [ECF No. 56, at 46:11–12]. Officers entered the front bedroom of the house, where Mr. Lark was holding his child. *Id.* at 23. Officers arrested him and searched his person, finding a wad of cash in his pocket. *Id.*

While some officers stayed at Mr. Lark's home to secure the scene, Det. Daniels left to apply for a search warrant for Mr. Lark's residence. *Id.* He testified that before he left Mr. Lark's residence, he "discuss[ed] the drafting of the search warrant" with two supervisors on scene. *Id* at 51–52. The supervisors told him that despite Mr. Lark never receiving or possessing drugs, the controlled delivery could be considered successful because Ms. Dunlap brought the package within 20 feet of

5

Mr. Lark's residence. [ECF Nos. 57, at 4; 57-4, at 2–3, 57-5, at 3]. In his affidavit to obtain the search warrant, Det. Daniels stated that "[a] controlled delivery was *conducted*" at Mr. Lark's residence that night in which "[t]he package Mrs. Dunlap *delivered* . . . contained . . . fentanyl." [ECF No. 50-1, at 5 ¶ 3.d. (emphasis added)]. However, in the hearing, Det. Daniels admitted that he knew Ms. Dunlap did not actually deliver the package of drugs to Mr. Lark:

> THE COURT: So your testimony here today is Ms. Dunlap never, in your presence on that night or early morning hours, ever delivered any controlled substance to the Mr. Lark?
> THE WITNESS: That's correct, yes, sir. She never actually got close enough to give the package to the Mr. Lark.
> THE COURT: And you're certain of that?
> THE WITNESS: I'm certain of that, yes, sir.

[ECF No. 56, at 47–48]. Det. Daniels explained in the affidavit that the officers forced entry into Mr. Lark's home because with "Mr. Lark[']s violent criminal history and information provided by CI[]s that he regularly keeps firearms inside the residence[,] Detectives were concerned he could be arming himself." [ECF No. 50-1, at 5 ¶ 3.c.]. Det. Daniels's affidavit further stated that "Mrs. Dunlap . . . has completed [the Ohio to West Virginia] trip on approximately three occasions and each time *delivered* the package" of drugs to Mr. Lark at his residence. *Id.* (emphasis added). No timeline for these trips was given. Det. Daniels did not provide testimony to the magistrate judge beyond what was provided in his affidavit. [ECF No. 56, at 47:13–16].

6

The magistrate judge granted the search warrant with the crime on its face listed as "60A-4-401(a)(ii) . . . Possession with intent to distribute To Wit: fentanyl, a Schedule II controlled substance in violation of the Uniform Controlled Substances Act." [ECF No. 50-1, at 1]. During the subsequent search of Mr. Lark's home, police found the handgun charged in Counts Four and Six of the Indictment in the back of the laundry machine as described by Ms. Dunlap. *Id.* at 15; [ECF No. 20, at 4, 6]. Police additionally listed the cash found in Mr. Lark's pocket as seized pursuant to the search warrant. *Id.* No drugs were found at the residence.

Mr. Lark made his initial appearance on the six-count Indictment on June 17, 2021. [ECF No. 26]. He subsequently moved to suppress all evidence seized by police at his home during the night of the controlled delivery attempt. [ECF No. 41]. The court held a hearing on the motion on October 27, 2021. [ECF No. 51]. During the hearing Det. Daniels conflictingly testified multiple times, stating both that the attempted delivery of drugs to Mr. Lark at his home was the basis of probable cause for acquiring the search warrant and that Ms. Dunlap never delivered any drugs to Mr. Lark at his home that night. [ECF No. 56 at 35:16–18; 36:16–25; 37:1–4; 60:21–25; 61:1–21]. Noting the factual discrepancies between Det. Daniels's warrant affidavit and his testimony, the court inquired:

> Anything else on the *Franks* issue like arguing even though the witness has said he didn't think he had probable cause absent this substantive—the record will show what it is, but do you want to argue anything further about the . . . affidavit supporting the warrant with regard to this issue?

7

[ECF No. 56, at 63:14–20]. Upon further inquiry, both parties agreed that they wanted to brief the issue. *Id.* at 64.

The government provided the court with the 18-minute audio file from the recording device that Ms. Dunlap carried during the attempted controlled delivery as an exhibit to its brief. [ECF Nos. 57, at 3 n.2; 57-3]. The government pointed out that the recording includes Ms. Dunlap's cell phone conversation with Mr. Lark, police's forced entry to Mr. Lark's home, a conversation between Det. Daniels and Ms. Dunlap, and part of Det. Daniels's conversation with his supervisors. *Id.* On the recording, police are heard approaching Mr. Lark's door shortly after Ms. Dunlap exits her vehicle. [ECF No. 57-3, at 9:13]. While knocking on Mr. Lark's door, an officer clearly yells "Police, search warrant!" *Id.* at 9:21. After police enter Mr. Lark's home and arrest Mr. Lark, Det. Daniels approaches Ms. Dunlap and sounds surprised both that no delivery had taken place and that Ms. Dunlap was behind officers when they entered Mr. Lark's home:

> DANIELS: So what happened? What happened?
> DUNLAP: He saw me coming, the door was open, so that's [unintelligible]
> DANIELS: Where was you at?
> DUNLAP: I was behind [unintelligible]
> DANIELS: **You were behind us?**
> DUNLAP: Yeah.
> DANIELS: F**k. **So you never got to f****n' deliver it?** Okay.

*Id.* at 11:57–12:20 (emphasis added).

Thereafter, Det. Daniels takes the recording device from Ms. Dunlap and has a conversation with Sergeant Jason Webb and DEA Group Supervisor Lance

8

Lehnhoff where he explains to them what Ms. Dunlap told him happened with the controlled delivery and forced entry:

> DANIELS: You can't make this s**t up. So, when she's [holding] the phone he said "come on in the door's open." That's when we came around the corner right here. Went through the door, f*****g cracked through the front. She wasn't near him. She was right f*****g behind us. You're not gonna believe that's where she was [unintelligible] we come out of here yelling "police, police, police, police" he's leaning behind of it [unintelligible]. You believe that? **I thought she was in the house.** He said, "the door's open, come on in." We was coming up here, she was right behind us. She said, "I never f****n' seen him. I thought he'd be inside." But we seen him f****n' slam the door on us. We're like "police, open the f*****g door." I mean, that's a felony. I think we got enough charges for the state, don't you?

[ECF Nos. 57, at 3 n.2; 57-3, at 13:57–14:27 (emphasis added)].

Recognizing the fact that Ms. Dunlap never delivered the drugs to Mr. Lark, the officers briefly discussed what Det. Daniels would write in his affidavit for the search warrant:

> OFFICER 1: Articulate the fact that—
> OFFICER 2: You got the recorded calls.
> DANIELS: Yeah.
> OFFICER 2: You didn't want to go in there because of his behavior, stuff like that.
> DANIELS: Yeah.
> OFFICER 2: It was a safety issue. And then later, he thought you were police, he shut the door in your face and tried to run, and it kinda blew the whole deal. Whatever.

[ECF No. 57-3, at 15:58–16:17].

The government argues that its forced entry of Mr. Lark's home, arrest of Mr. Lark, and search incident to arrest were reasonable based on the doctrine of exigent circumstances. Mr. Lark argues that the exigent circumstances exception to the Fourth Amendment warrant requirement does not apply because there is "no evidence that Mr. Lark was doing anything inside the home other than deny[ing] police entry." *Id.* at 4. He argues that under the exclusionary rule, all evidence collected on March 17, 2021, should be suppressed as fruit of the poisonous tree.

Along with his initial motion to suppress [ECF No. 41], Mr. Lark argues that he is entitled to a *Franks* hearing because he has made a substantial preliminary showing that false statements, made knowingly, intentionally, or with reckless disregard for the truth, and necessary to the magistrate judge's finding of probable cause, were included in the affidavit supporting the search warrant. [ECF No. 59, at 5–6 ("Daniels' use of the word 'delivered' . . . falsely indicated to the Magistrate that the drugs were actually physically given or conveyed to [Mr. Lark] on March 17, 2021.")]. The government argues that Det. Daniels's statement that a package was delivered to Mr. Lark was not false because Ms. Dunlap brought the drugs to Mr. Lark's house, and even without the statement, the information contained in the warrant affidavit was sufficient to support a finding of probable cause. [ECF No. 57, at 7, 18].

## II. DISCUSSION

Some of the evidence that Mr. Lark seeks to suppress was seized in a search

incident to arrest that took place after the police warrantlessly forced entry into Mr. Lark's home. Conversely, some evidence was seized after the police acquired a search warrant for Mr. Lark's home. I divide my analyses accordingly but reach the same result as to all evidence seized.

### A. Exigent Circumstances Do Not Justify Officers' Warrantless Entry

The Fourth Amendment protects the right of the people to be secure in their persons, houses, and effects against unreasonable searches and seizures. The "very core" of this guarantee is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (U.S. 2021). As such, warrantless searches and seizures inside a home are presumptively unconstitutional. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). However, "because the ultimate touchstone of the Fourth Amendment is reasonableness," the Supreme Court has articulated certain exceptions to the Fourth Amendment's general requirement for a search warrant. *Id.*

One such "reasonableness" exception is exigent circumstances. *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). The rationale underlying the exigent circumstances exception is a "compelling need for official action and no time to secure a [search] warrant." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013). The "exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 469 (2011). To determine whether a given emergency justifies

11

officers bypassing Fourth Amendment protections, courts look to officers' "objectively reasonable belief [that entry was necessary] . . . based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013). The Fourth Circuit has articulated five factors the court should consider when determining whether an exigency reasonably justified a warrantless search:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Id.* The "existence of exigent circumstances must be determined as of the moment of the warrantless entry of the officers onto the premises." *Hupp v. Cook*, 931 F.3d 307, 327 (4th Cir. 2019) (internal citations omitted). As such, the second, fourth, and fifth factors are not relevant to my exigency analysis, as they pertain to the destruction of contraband, not to officers' articulated safety concerns.

As to the first factor, over two hours passed between the time police brought Ms. Dunlap to the station and when police attempted the second controlled delivery, indicating that police had ample time to secure an arrest and/or search warrant for Mr. Lark and his home. Moreover, Det. Daniels testified that he needed to witness Ms. Dunlap deliver drugs to Mr. Lark before he believed he would have the facts necessary to apply for a search warrant. That being the case, the government has

12

not explained why police could not have allowed Ms. Dunlap to complete a controlled delivery using the recording device and then return to the home after obtaining a search warrant. Though Det. Daniels claimed officers had determined it was unsafe for Ms. Dunlap to enter the residence, there has been no explanation for that conclusion. I find that the police had time to obtain arrest and search warrants for Mr. Lark and his residence.

As to the third factor, Det. Daniels testified that because officers had information about a possible gun and child in the home, they believed that "it would be safer for everyone" for the police to force entry and arrest Mr. Lark. [ECF No. 56, at 22:1–7]. However, nothing in the record indicates that Mr. Lark was a risk to the safety of Ms. Dunlap, his daughter, police officers, or himself. Ms. Dunlap indicated she had made the trip without incident before, and there are no incidents of aggression involving firearms between Mr. Lark and police officers in his criminal history. [ECF No. 13]. If anything, on the recording, the purported safety issues discussed by Det. Daniels and his supervisors suggests an after the fact justification for entering the residence. [ECF No. 57-3, at 15:58–16:17]. Det. Daniels stated that police's rationale for entering the house after Mr. Lark closed the front door was "for a felony arrest"—but at the time, the police had not observed Mr. Lark commit any felony.[3] [ECF No. 56, at 65:4–7]. Contrary to Det. Daniels's assertion on the recording, closing the door to police is not a felony. Rather, it is a legitimate

---

[3] The court additionally notes that "[a]n arrest warrant is always required for an arrest inside the arrestee's home, even when probable cause exists, absent exigent circumstances." *United States v. McCraw*, 920 F.2d 224, 228 (4th Cir. 1990).

13

assertion of Fourth Amendment. *See Kentucky v. King*, 563 U.S. 452, 469–70 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door . . . the occupant has no obligation to open the door or to speak.").

Importantly, on the audio recording from the night of the search, an officer clearly yells the false claim that police have a search warrant during the police's forced entry of Mr. Lark's home. [ECF No. 57-3, at 9:21]; *see King*, 563 U.S. at 469 (holding the exigent circumstances exception does not apply when police gain entry to a defendant's home through actual and threatened violations of the Fourth Amendment). Given these facts, I find that there were no exigent circumstances that justified officers' forced entry of Mr. Lark's home. Because I find that no exception to the warrant requirement applies, I order the evidence seized after officers' illegal entry to Mr. Lark's home be suppressed.

### B. *Franks* Requires Voiding the Search Warrant

There is a strong "presumption of validity with respect to [an] affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Nevertheless, in *Franks*, the Supreme Court carved out a narrow exception to this rule, holding that the Fourth Amendment guarantees Defendants the right to challenge the veracity of a warrant affidavit if they can show that the warrant included intentional or reckless falsehoods. *Id.* at 155–56.

To obtain a *Franks* hearing, "a defendant must make a substantial preliminary showing that (1) law enforcement made a false statement; (2) the false

statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to the finding of probable cause." *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019) (citation omitted). As "allegations of negligence or innocent mistake are insufficient . . . [t]he burden of making the necessary showing is thus a heavy one to bear." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008) (citation omitted).

"The first required showing, of falsity, cannot be conclusory and must rest on affidavits or other evidence." *Moody*, 931 F.3d at 370 (citation omitted). Put slightly differently, "there must be evidence showing that the statements at issue are objectively false." *Id*. Here, the warrant affidavit states that "[a] controlled delivery was *conducted*" at Mr. Lark's residence in which "Mrs. Dunlap *delivered*" a package of suspected fentanyl. [ECF No. 50-1, at 5 ¶ 3.d. (emphasis added)]. Further, the crime on the face of the warrant was listed as possession of fentanyl with intent to distribute. *Id*. at 1. However, Det. Daniels plainly stated on cross examination that no fentanyl was ever physically delivered to or possessed by Mr. Lark:

> Q. And there was not—and when you actually did the controlled delivery—the attempted controlled delivery, there was never actually any drugs exchanged, correct?
> A. That's correct, yes, sir.
> Q. Okay. And Ms. Dunlap wasn't even—and just correct me if I'm wrong. When Ms. Dunlap was walking up towards the door, the police jumped in front of her, right?
> A. I did, yes, sir.
> Q. So the drugs never made it to Mr. Lark's front door, correct?
> A. That's correct, yes, sir.

15

[ECF No. 56, at 35:2–13]. Mr. Lark did not discuss delivery of drugs over the phone with Ms. Dunlap, did not acquire drugs from Ms. Dunlap before he was arrested, and police found no illegal drugs in his house. [ECF No. 41, at 2]. Det. Daniels's sworn testimony during the suppression hearing makes plain that his statement in the affidavit that fentanyl was *delivered* to Mr. Lark is objectively false. Therefore, I find that Mr. Lark has satisfied the requirement of falsity by a preponderance of the evidence.

The second showing requires an accused to demonstrate knowing and "intentional falsity or reckless disregard for the truth[.]" *Moody*, 931 F.3d at 370–71. Once again, "[t]his showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 171). Here, there is detailed proof that Det. Daniels recognized on the evening of March 17, 2021, that there was no delivery of drugs because Mr. Lark did not receive the package. [ECF No. 57-3, at 11:57–12:20 (DANIELS: "You were behind us?" DUNLAP: "Yeah." DANIELS: "F**k. So you never got to f****n' deliver it? Okay.")]. And Det. Daniels testified that he did not believe he had probable cause for a warrant in the absence of actual delivery of the drugs. [ECF No. 56 at 35:16–18; 36:16–25; 37:1–4; 60:21–25; 61:1–21]. He testified that he presented the drugs as "delivered" to the magistrate because his supervisors told him the operation could be considered a complete controlled delivery because the package of drugs was taken by Ms. Dunlap to Mr. Lark's home and Mr. Lark was waiting at the door for

Ms. Dunlap's arrival. [ECF No. 56, at 51–52]. It may be true that Det. Daniels believed his supervisors' assertions. However, in *Franks*, the Court noted that "police [can]not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks v. Delaware*, 438 U.S. 154, 164 n.6 (1978). I find that, at minimum, the record very clearly supports a finding that Det. Daniels acted with reckless disregard for the truth when he stated in the warrant affidavit that Ms. Dunlap "delivered" fentanyl to Mr. Lark when he knew that no delivery or exchange had taken place.

With respect to the final showing, "the defendant must show materiality—that is, that the false statements were necessary to the finding of probable cause." *Moody*, 931 F.3d at 371 (quoting *Franks*, 438 U.S. at 156). In assessing materiality, the court strips the allegedly false statements from the affidavit and determines whether the remaining portion of the warrant application would still support a finding of probable cause. *Id.* If the answer is yes, a *Franks* hearing is unavailable. *See Colkley*, 899 F.2d at 300. A search warrant is validly issued "only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. Bosyk*, 933 F.3d 319, 330 (4th Cir. 2019).

Here, Det. Daniels stated multiple times during the hearing that the controlled delivery of drugs to Mr. Lark at his home was the basis of probable cause for acquiring the warrant to search Mr. Lark's residence. [ECF No. 56 at 35:16–18;

17

36:16–25; 37:1–4; 60:21–25; 61:1–21]. Excluding the controlled delivery on March 17, 2021, the only information in the warrant affidavit that ties criminal activity to Mr. Lark's home is Ms. Dunlap's statement to police that she had delivered drugs there "on approximately three occasions." [ECF No. 50-1, at 5 ¶ 3.c.]. This statement alone does not provide evidence sufficient to show that *any* drugs were or would be present in Mr. Lark's home. There is no indication as to when Ms. Dunlap's alleged prior deliveries occurred; at least one of them, the delivery at issue, was never completed. Without any indication of when the alleged deliveries occurred, it was not possible for the magistrate judge to determine whether the "allegations of facts [were] so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Bosyk*, 933 F.3d at 330. And while Det. Daniels's affidavit contains information about Mr. Lark's alleged involvement with previous controlled drug buys, neither occurred at Mr. Lark's home, and there are no indications that the drugs sold were ever kept there.

    I find that without the reckless falsehoods included in the warrant affidavit by Det. Daniels, the information remaining does not provide a sufficient nexus between Mr. Lark's home and drug-related activity that would support a finding of probable cause to issue a search warrant. Mr. Lark has more than established the substantial preliminary showing for a *Franks* hearing.

    I find that on these facts, though, there is no need for further hearing. If a court concludes that "a *Franks* hearing is appropriate and an affiant's material

18

perjury or recklessness is established by a preponderance of the evidence, the warrant 'must be voided' and evidence or testimony gathered pursuant to it must be excluded." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 156). Although a *Franks* hearing would be appropriate, I find it unnecessary here because the affiant's material misrepresentations were completely proven by the government's own evidence: Det. Daniels's sworn testimony during the suppression hearing and the government audio from the recording device carried by Ms. Dunlap during the March 17, 2021, controlled delivery. This evidence submitted to the court certainly establishes at least a reckless disregard for the truth by a preponderance of the evidence.

Additional sworn testimony in this matter will not be probative to the court. There is no conceivable testimony that can controvert the reckless disregard of material fact present in the warrant affidavit: Det. Daniels knew that no actual delivery of drugs had taken place, and he knew that he had not witnessed Mr. Lark possess fentanyl. Further, the recorded discussion with his supervisors paints the picture of an after the fact attempt to manufacture an excuse to support their breaking into Mr. Lark's home. I order that all evidence seized by police at Mr. Lark's home on March 17, 2021, be suppressed.

### III. CONCLUSION

Defendant's Motion to Suppress Evidence [ECF No. 41] is **GRANTED.** The court **DIRECTS** the Clerk to send a copy of this Order to the Mr. Lark and counsel,

the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: December 14, 2021

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

20