IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:21-cr-00084

CHE DUSHON LARK

MEMORANDUM OPINION AND ORDER

Pending before the court is the government's Motion for the court to reconsider its finding that Detective Wesley Daniels made a statement with reckless disregard for the truth in an affidavit to obtain a search warrant for Defendant Che Lark's home. [ECF No. 66]. For the reasons below, the Motion is **DENIED**.

I. Background

A. Facts

Detective Wesley Daniels is a fifteen-year veteran of the Charleston Police Department [ECF No. 56, at 7:19] who worked Mr. Lark's case with the Metropolitan Drug Enforcement Network Team (MDENT). [ECF No. 56, at 7:14–21]. MDENT is an organization under the Kanawha County Sheriff's Office that is made up of members from several local, state, and federal law enforcement agencies with the stated goal of "combat[ting] the distribution and manufacturing of drugs." *MDENT (Drug Unit)*, Kanawha Cty. Sheriff's Off., https://www.kanawhasheriff.us/law-

enforcement/mdent-drug-unit/ (last visited on Feb. 22, 2022). The following factual narrative is based on evidence provided by the government.

Det. Daniels learned from a confidential informant that Mr. Lark, while on home confinement pending prosecution of state charges, was selling drugs. [ECF No. 56, at 7:24–25]. Det. Daniels followed up by planning and carrying out two controlled drug buys between Mr. Lark and a confidential informant. *Id.* at 8. Mr. Lark was not present for either transaction. Rather, the drug transactions arranged by the confidential informant were concluded by Rebecca Dunlap, who made the deliveries and collected the buy money. [ECF Nos. 47, at 3–4; 56, at 8, 9:15–20]. Police, having reason to believe Ms. Dunlap was working in concert with Mr. Lark, obtained a warrant authorizing the placement of a GPS tracker on her car. [ECF No. 56, at 10:20–22].

Using that device, Det. Daniels tracked Ms. Dunlap to and from Columbus, Ohio, on March 16, 2021. [ECF No. 50-1, at 4 ¶ 3.b.]. Upon Ms. Dunlap's return to West Virginia, police followed her car, observed a traffic violation, and stopped her. [ECF No. 56, at 11:20–23]. Det. Daniels spoke with Ms. Dunlap, who told him that she had travelled to Columbus to pick up a package while acting as a drug courier for Mr. Lark. *Id.* at 12. She gave consent for police to search her car. Police found a package containing approximately 900 grams of methamphetamine and 200 grams of fentanyl. *Id.* Ms. Dunlap immediately cooperated with the police. She returned with them to the MDENT office, where they discussed her involvement with Mr.

2

Lark's drug activities. *Id.* She told Det. Daniels that she had made the trip to Columbus, Ohio, to bring drugs to Mr. Lark's home twice before, although she did not indicate when those trips occurred. *Id.* at 19:5–6.

Det. Daniels decided that police would conduct a controlled delivery in which Ms. Dunlap would deliver a small portion of the drugs to Mr. Lark at his home. *Id.* at 12. Over a period of several hours, police made two attempts to complete the controlled delivery. At no point did police seek a warrant to search Mr. Lark's home or to arrest him. *Id.* at 32–33. The first controlled delivery attempt failed. Ms. Dunlap parked near Mr. Lark's residence and called him multiple times, but he did not answer. *Id.* at 43:6–8. Police and Ms. Dunlap returned to the MDENT office. A bit later, Mr. Lark returned Ms. Dunlap's phone calls and told her to come to his house. *Id.* at 18.

The police and Ms. Dunlap made a second attempt to deliver drugs to Mr. Lark. This attempt, made during the early hours of March 17, 2021, and involving at least ten officers, was also a failure. *Id.* at 21:5–9. This time, before Ms. Dunlap could reach Mr. Lark's front door, police mistakenly assumed the exchange had taken place and rushed to Mr. Lark's door. *Id.* at 20. Det. Daniels testified that he saw Mr. Lark open his front door, note the presence of law enforcement, and promptly close the door without exiting his residence. *Id.* The officers then forced their way into Mr. Lark's home while falsely yelling that they had a search warrant. They arrested Mr. Lark and searched his person. *Id.* at 22–23; [ECF No. 57-3, at 9:21].

Det. Daniels testified that the plan for the second controlled delivery attempt was always for Ms. Dunlap to keep away from Mr. Lark's front door and "under no circumstances" to go inside his home. [ECF No. 56, at 19]. Police officers' rationale, stated after the fact, was concern for safety. Police were aware that Ms. Dunlap had previously completed deliveries to Mr. Lark with no threats to her safety, and an audio recording of the controlled delivery attempt supplied to the court by the government contradicts Det. Daniels's testimony. *Id.* at 19, 43. The recording reveals that on the night of the search, Det. Daniels was surprised to learn that Ms. Dunlap had not completed the delivery to Mr. Lark before police intervened:

> DANIELS: So what happened? What happened?
> DUNLAP: He saw me coming, the door was open, so that's [unintelligible]
> DANIELS: Where was you at?
> DUNLAP: I was behind [unintelligible]
> DANIELS: **You were behind us?**
> DUNLAP: Yeah.
> DANIELS: F**k. **So you never got to f****n' deliver it?** Okay.

[ECF No. 57-3, at 11:57–12:20]. According to the audio, Det. Daniels believed Ms. Dunlap to be in Mr. Lark's home before they rushed his door.

> DANIELS: You can't make this s**t up. So, when she's [holding] the phone he said "come on in the door's open." That's when we came around the corner right here. Went through the door, f*****g cracked through the front. She wasn't near him. She was right f*****g behind us. You're not gonna believe that's where she was [unintelligible] we come out of here yelling "police, police, police, police" he's leaning behind of it [unintelligible]. You believe that? **I thought she was in the house.** He said, "the door's open, come on in." We was coming up here, she was right behind us. She said, "I never f****n' seen him. I thought he'd be inside." But we seen him f****n' slam the door on us. We're

4

> like "police, open the f*****g door." I mean, that's a felony.
> I think we got enough charges for the state, don't you?

*Id.* at 13:57–14:27 (emphasis added).

After the second controlled delivery attempt failed, and after police entered Mr. Lark's home and arrested him, Det. Daniels decided to seek a warrant to search the rest of the Lark home. [ECF No. 56, at 24]. He consulted with two of his supervisors on the scene before returning to the MDENT office to prepare an application for a search warrant. *Id.* at 46, 54. The recording of the controlled delivery attempt reveals the officers discussing what Det. Daniels would write in his affidavit for the search warrant:

> OFFICER 1: Articulate the fact that—
> OFFICER 2: You got the recorded calls.
> DANIELS: Yeah.
> OFFICER 2: You didn't want to go in there because of his behavior, stuff like that.
> DANIELS: Yeah.
> OFFICER 2: It was a safety issue. And then later, he thought you were police, he shut the door in your face and tried to run, and it kinda blew the whole deal. Whatever.

[ECF No. 57-3, at 15:58–16:17]. Moreover, he testified that his supervisors told him to assert in his affidavit that the controlled delivery was complete because Mr. Lark was at his residence presumably waiting to accept the drugs. [ECF No. 56, at 24].

In his affidavit for the warrant, as prepared and submitted to the magistrate judge, Det. Daniels stated under oath that "[a] controlled delivery was *conducted*" at Mr. Lark's home on March 17, 2021, in which "[t]he package . . . *delivered* . . . contained . . . fentanyl." [ECF No. 50-1, at 5 ¶ 3.d. (emphasis added)]. As Det. Daniels

5

made clear in his later testimony, he knew that Ms. Dunlap only got within 20 feet of Mr. Lark's residence, drugs were not delivered, and Mr. Lark never received or possessed the drugs:

> THE COURT: So your testimony here today is Ms. Dunlap never, in your presence on that night or early morning hours, ever delivered any controlled substance to the Mr. Lark?
> DANIELS: That's correct, yes, sir. She never actually got close enough to give the package to the Mr. Lark.
> THE COURT: And you're certain of that?
> DANIELS: I'm certain of that, yes, sir.

[ECF No. 56, at 47–48]. The magistrate judge issued the search warrant with the crime on its face listed as possession of fentanyl with intent to distribute. [ECF No. 50-1, at 1]. Plainly, the warrant was based upon the false statements in Det. Daniels's affidavit submitted to the magistrate judge.

Det. Daniels returned to the Lark home with the warrant, and police completed a search. They found $900 in U.S. currency, five cell phones, and one firearm, as charged in Counts Four and Six of the six-count indictment against Mr. Lark. [ECF Nos. 20, at 4, 6; 50-1, at 15]. No drugs were found in the home.

### B. Procedural History

On June 10, 2021, a grand jury returned a six-count indictment against Mr. Lark, charging him with: 1) possession with intent to distribute heroin and methamphetamine; 2) distribution of methamphetamine; 3) distribution of fentanyl; 4) felon in possession of a firearm; 5) conspiracy to distribute methamphetamine and

fentanyl; and 6) possession of a firearm in furtherance of a drug trafficking crime. [ECF No. 20].

Mr. Lark filed a motion to suppress all the evidence that was seized at his home on March 17, 2021. *See* [ECF No. 41]. I ordered the government to file the search warrant and affidavit with the court and held a hearing on the suppression motion. [ECF Nos. 49, 51]. At the hearing, Det. Daniels, who witnessed the failed controlled delivery attempt, repeatedly contradicted his search warrant affidavit and testified that on the night of the attempted controlled delivery, no package of fentanyl was ever successfully delivered to or possessed by Mr. Lark. [ECF No. 56 at 35:2–13; 47:20–25; 48:1–3; 54:1–4; 57:11–13; 63:4–13].

Upon further inquiry by the court, both parties agreed that they wanted to brief the issues with the warrant affidavit as implicated by *Franks v. Delaware*, 438 U.S. 154 (1978). The government filed as an exhibit to its *Franks* brief the audio recording of the attempted controlled delivery on March 17, 2021. On the recording, Det. Daniels is heard to say several times that he knew no fentanyl was delivered to or possessed by Mr. Lark during the early hours of March 17, 2021. [ECF No. 57-3].

I held that Mr. Lark had made a substantial showing that Det. Daniels included reckless falsehoods in the search warrant affidavit that were material to the magistrate judge's finding of probable cause, and therefore *Franks* required voiding the warrant. *See generally Franks v. Delaware*, 438 U.S. 154 (1978); [ECF No. 64]. Accordingly, and because exigent circumstances did not justify the officers'

warrantless entry into Mr. Lark's home, I granted Mr. Lark's motion to suppress the evidence. *Id.*

After my ruling, the Assistant United States Attorney prosecuting this case sent two investigators to interview the magistrate judge who issued the search warrant. *See* [ECF No. 66-1]. Based on the information obtained from the magistrate judge during that interview, the government filed this motion to reconsider.

The government shared that, contrary to the findings necessary for issuing the search warrant, the magistrate judge "was aware that Lark never took possession of the drugs used in the controlled delivery based upon the information within the affidavit." *Id.* at 1. The government now argues that because the magistrate judge says he was not actually misled by Det. Daniels's affidavit, I should reconsider my finding that Det. Daniels acted in reckless disregard for the truth when he wrote the warrant affidavit swearing that the controlled delivery had been completed. [ECF No. 66, at 3].

On February 15, 2022, a grand jury returned a five-count Superseding Indictment against Mr. Lark. [ECF No. 75]. This indictment retained the charges in counts one through three of the original indictment; removed the firearm charges, counts four and six; expanded the scope of the drug conspiracy in count five from about one month to about one year; and added a new charge, attempted possession of methamphetamine and fentanyl on March 17, 2021, the date of the attempted controlled delivery. *Id.*

8

## II. Discussion

In this Motion, the government states that it does not ask me to reconsider my decision to suppress the evidence seized from Mr. Lark's home on March 17, 2021. [ECF No. 66, at 1]. Rather, the government requests that I reconsider my finding "that Detective Daniels made a statement in the March 17, 2021, search warrant affidavit with reckless disregard for the truth of that statement" because that finding is potentially harmful to Det. Daniels's career. *Id.* at 1, 3. Although not articulated by the government, this concern is likely due to a component of the *Brady* rule which gives the prosecution the duty to disclose to the defendant material evidence that the defendant could use to impeach adverse witnesses or exculpate himself. *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).[1]

I decline to reconsider my finding that Det. Daniels acted with reckless disregard for the truth of the statements he made in his search warrant application affidavit. "'Reckless disregard' can be established by evidence that an officer acted with a high degree of awareness of [a statement's] probable falsity, that is, when viewing all the evidence, the affiant must have . . . had obvious reasons to doubt the accuracy of the information he reported." *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007). The evidence on the record is clear that Det. Daniels knew

---

[1] I note that the failure to disclose such impeachment material only constitutes a violation of due process where the lost opportunity for impeachment is so critical that there is a reasonable probability that a different result would have been reached if the statement had been made available for that purpose. *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).

drugs were not delivered or possessed by Mr. Lark because he witnessed the controlled delivery attempt himself and testified to those facts.

While the reconsideration issue does not require further analysis, the myriad events in this case, including this motion and its supporting exhibits, convince me that I have an obligation to say more about the roles we each play in protecting the integrity of our criminal justice system. The oaths of office taken by police officers, prosecutors, lawyers, and judges each have the central promise to uphold the Constitution of the United States. It is the common bond necessary to bind together this participatory democracy. Neither the police, the prosecutor, nor the judge may cast the personal burdens imposed by their oaths of office upon one of the others.

In the first instance, a police officer must act with regard to his trained understanding of the constitutional strictures upon his official behavior. The prosecutor, acting under the same sworn obligations, must discourage police misconduct and even punish it where necessary. The widespread notion that it is for judges alone to decide the constitutionality of an act or statute is simply wrong. It is not for the prosecutor to minimize unconstitutional conduct or advocate for ignoring such behaviors to curry favor or enhance the relationship between police departments and prosecutor's offices. Rather, a prosecutor should work with the police to ensure the practical and proper application of constitutional principles. When prosecutors overlook, tolerate, or fail to intervene in the Constitutional failures of law enforcement, they abdicate the responsibilities imbued by their oaths of office.

Under their constitutional oath, prosecutors have an independent responsibility to evaluate the legitimacy of the evidence they put forth to make their case. In that regard, they should analyze whether the evidence was gathered constitutionally and not focus solely on the question of the likelihood of admissibility. *See* Russell M. Gold, *Beyond the Judicial Fourth Amendment: The Prosecutor's Role*, 47 U.C. Davis L. Rev. 1591, 1595 (2014). The Assistant United States Attorneys should have learned there were glaring problems with important evidence in this case when they presumably talked with Det. Daniels in preparation for the suppression hearing. Instead, the Assistant United States Attorneys did not either recognize or address the problems with the warrant until Det. Daniels's testimony at the hearing, after which they nevertheless filed briefing arguing that the term "delivered" could fairly describe a situation where no delivery occurred. Attached to that briefing they filed the audio recording of the controlled delivery attempt excerpted above, which is clearly damning of Det. Daniels. Most recently, they filed a superseding indictment which removed the firearm charges and added a new charge, *attempted* possession of methamphetamine and fentanyl on March 17, 2021, the date of the *attempted* controlled delivery. [ECF No. 75]. It is surely apparent to the government that their concern with the damage to Det. Daniels's career would have been alleviated had these actions been taken when they first learned of the evidentiary problems.

Every Assistant United States Attorney is taught that the prosecutor's role transcends the role of adversary. The United States Attorney "is the representative

11

not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). This brings me finally to the actions of the United States Attorneys Office in preparation for this motion to reconsider. In an event unique to me in my half-century as a lawyer and as a judge, the Assistant United States Attorney sent two investigators to interview the state magistrate judge who issued the search warrant for Mr. Lark's home. Those investigators questioned the magistrate judge regarding his judicial decision-making process, then wrote that process down in a memorandum that the government filed as an exhibit to this motion. *See generally* [ECF No. 66-1].

The Assistant United States Attorney's decision to interview a judicial officer and the judge's decision to entertain the interview are both improper. It is inherently intimidating to send federal officers to question a state magistrate judge, and it is clearly out of bounds for the magistrate judge to provide the interview regarding his judicial decision-making in a matter pending before this court. There are other serious concerns brought to light in the report of the magistrate judge's interview. *See id.* I will leave those to the West Virginia Office of Judicial Disciplinary Counsel and the West Virginia Supreme Court of Appeals. Moreover, I am anecdotally aware of the unusual number of suppression motions that have been granted in this district

in the past two years. I defer to the new United States Attorney to review this area of concern.

### III. Conclusion

The Motion to Reconsider is **DENIED**. [ECF No. 66]. The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: February 22, 2022

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE